## County of Lancaster, Petitioner v. Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued February 2, 1983, before Judges ROGERS, BLATT and CRAIG, sitting as a panel of three.

*Robert M. Frankhouser, Jr., Hartman, Underhill & Brubaker,* for petitioner.

*Bruce G. Baron,* Assistant Counsel, for respondent.

OPINION BY JUDGE CRAIG, March 17, 1983:

In this appeal, Lancaster County challenges the determination by the Department of Public Welfare (DPW) of the amount of money which the county was entitled to receive from the Commonwealth through the Medical Assistance Program.

The county operates the county nursing home facility, Conestoga View, with participation in the Medical Assistance Program,[1] through which the Commonwealth shares the financial support of the county home operation. At the end of each fiscal year, the Pennsyl-

---

[1] The Commonwealth's Medical Assistance Program is associated with the federal Medicaid system, and DPW administers the program pursuant to Section 201 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §201.

vania Auditor General's office audits the county home for DPW, and in each year from 1975 through 1977 the auditors determined that the home had earned investment income. Under the applicable regulation,[2] DPW reduced the payment to the county in those years by an amount attributed to such income.

The county appealed those reductions, and after a hearing, the hearing examiner concluded that the county had failed to show that the home did not have investment income and recommended that DPW dismiss the appeal. The examiner also concluded that the appeal for fiscal year 1975 had not been timely filed. DPW's Office of Hearings and Appeals adopted the recommendation, although not totally, and entered an order dismissing the appeals.

Here the issues are:

1. Was the county's appeal timely with respect to the year 1975?

2. Did the county home earn investment income?

Although our scope of review in this case is limited,[3] we agree with the county's position concerning investment income and will reverse that part of the order.

With respect to the appeal for the 1975 fiscal year, we note that the applicable regulation[4] provides a 30-

---

[2] The Manual for Allowable Costs for Skilled Nursing and Intermediate Care Facilities enumerates the expenses of the home for which the Commonwealth will reimburse the county. Among these is the following:

e. Interest expense *reduced by investment income* . . . will be recognized. (Emphasis added.)

5 Pa. B. 2933, §IV(D)(10)(e)(1975).

[3] We must affirm unless we find that the adjudication is in violation of constitutional rights, is not in accordance with law, is in violation of the agency's regulations or procedures, or that any necessary finding of fact is not supported by substantial evidence. 2 Pa. C. S. §704.

[4] 5 Pa. B. 2934, §VII (1975).

day period for filing an appeal with DPW. On March 25, 1977, the county learned that the auditors had adjusted 1975 for investment income, and, rather than file an appeal with DPW, the county undertook an exchange of letters with the Auditor General's office.

The county contends that through those letters the Auditor General's office waived the 30-day limitation. Nothing in the regulations permits the Auditor General to waive the DPW deadline for filing an appeal. At oral argument before this court, the county did not substantially contest this issue, and we agree with the hearing examiner that the appeal for 1975 was untimely and affirm the dismissal as to it.

The merits of the investment income issue remain as to the other years.

Under the Medical Assistance Program, DPW reimburses the county for the Commonwealth's share of expenses allowable under the program regulations.[5] DPW makes those payments in two ways, through interim reimbursements and annual adjustments.

In order to receive the monthly interim payments, the county pays the home's bills from the county general fund each month as they come due. The county then determines the Commonwealth's portion of those expenses, submits an invoice to DPW[6] and enters an account receivable on the county books. DPW sends a check for the amount of the invoice from one to three months later.

Because the per diem rate is an historical figure and the cost of providing health care is continually increasing, the monthly reimbursements never equal the

---

[5] Because of its participation in Medicaid, the Commonwealth then shares its portion of the burden with the federal government.

[6] The Commonwealth's share is based on a formula which multiplies the number of patient days by a per diem rate. The per diem rate is an historical figure, representing the average daily cost of care in earlier years.

Commonwealth's total share of the costs. Through the annual adjustment, paid after the year-end audit, DPW reimburses the county for the difference between the actual cost of care and the monthly interim payment. The county receives that payment fifteen to eighteen months after the end of the fiscal year.

Also relevant is the fact that Lancaster County maintains a centralized accounting system. The county deposits all its monies in a general fund, and it makes all disbursements from that single account. Because of its use of the pooled general fund, the county is able to purchase interest-bearing certificates of deposit and reduce the cost of county government to the taxpayers.

DPW contends that, because the funds which the County Commissioners had earmarked for the county home in 1976 and 1977 were included in the general fund, a portion of the interest earned was investment income attributable to the home. The county argues that the home operated at a constant deficit, and because (as the accounting experts for both sides agree) a deficit cannot earn interest, the home did not generate any investment income.[7]

The county home had two sources of revenue which are relevant;[8] it received money from the county and from the Commonwealth.

When the county pays a bill for the home, it is satisfying not only its own share of the cost, but also the Commonwealth's share. The county regards that payment of the Commonwealth's share as an advancement; and it views the monthly and annual checks as reimbursements, or repayments, of those advances.

---

[7] The parties have appealed only the question of whether any setoff of investment income was proper. The computation of the exact amount involved was reserved.

[8] There was no testimony concerning income from other sources, such as private donations or trust funds; we have no question about interest earned on such funds before us.

The hearing officer found, and we agree, that the payments made by the Commonwealth were reimbursements. DPW's contention appears to be that, if those reimbursements earned interest, that interest constituted investment income attributable to the home.

A simple analogy will illustrate why DPW's contention must fail. A and B borrow money and purchase equal interests in property. Their monthly loan payments are $200 and each pays $100. One month A cannot make his half of the loan payment, and B pays it for him. Later A pays B $50 of the money which B had advanced to A. If B places the $50 in a savings account, the interest it earns belongs to B and will not serve to reduce the size of the debt. B is still entitled to receive the full $50 balance due from A.

The auditors indicated that, if the county had either presented proof of a daily deficit or used a so-called "enterprise fund"[9] for accounting, they would have been satisfied that a constant deficit existed. Because the county failed to do either, the hearing examiner found the county had not satisfied its burden of proof.

However, that interpretation by the hearing examiner was incompatible with DPW's own regulations and consequently not in accordance with applicable law.[10] The pertinent regulations concerning recordkeeping require "adequate financial records and statistical data" and that the information be "current, accurate, and in sufficient detail to support the claim for cost reimbursement."[11]

In order to show a daily deficit, the home would have had to make a complete assessment of its finan-

---

[9] The record does not fully explain what an enterprise fund is.

[10] *Felker v. Department of Public Welfare*, 50 Pa. Commonwealth Ct. 90, 411 A.2d 1297 (1980).

[11] 5 Pa. B. 2930, §III(B) (1975).

cial position on a daily basis. The regulations do not mandate that the home net its records daily. Indeed, in view of the considerable time and expense involved, such a requirement would most probably prove unworkable. Similarly, as DPW's own expert testified, the regulations do not require the homes to employ the enterprise fund system.[12]

Nancy Steffy, the deputy controller of the county, testified repeatedly that the county home always had a cash deficit and that no investment funds were ever attributable to the home.[13] David A. Brown, the accountant for the county who testified as an expert, stated that "at any point in time on a cash flow basis, there is no income to be invested. . . ."[14] DPW's only witness, Raymond F. Rall, Jr., who also testified as an accounting expert, agreed that if a constant deficit existed, no investment income would be attributable to the home.[15] Nothing in his testimony refuted, or even contradicted, the statements of the county's witnesses that a constant deficit did in fact exist.

Even though substantial evidence supported the hearing examiner's findings of fact, in order for the agency's decision to stand, the findings must also support the conclusions of law.[16] Because the examiner misapplied the regulation and employed an erroneous standard of proof, the findings of fact do

---

[12] DPW's expert witness, Raymond F. Rall, Jr. testified that he could point to no regulation requiring use of an enterprise fund. Record at 92.

[13] Record at 42, 43, 52.

[14] Record at 59.

[15] Record at 95, 96.

[16] *Department of Environmental Resources v. Mill Service, Inc.,* 21 Pa. Commonwealth Ct. 642, 347 A.2d 503 (1975) ; *Commission of Professional and Occupational Affairs, State Real Estate Commission v. Bewley,* 1 Pa. Commonwealth Ct. 85, 272 A.2d 531 (1971).

not support his conclusion that the county did not carry its burden of proof.

Before an entity may earn investment income, it must possess some assets to invest. The Office of Hearings and Appeals, in its order adopting the recommendation of the hearing examiner, took "exception" to the examiner's implication that the home had any control over the money in the county general fund. The order specifically stated that there was no evidence in the record to support the allegation that the general fund monies were subject to any control or disposition by the home.

We agree with that statement. We cannot fairly assign to the county home any investment income arising from principal not controlled by, or otherwise attributable to, the county home.

Particularly because the record convinces us that all accounts reasonably attributable to the county home suffered a constant deficit, no assignment of investment income to the home is supportable. We therefore reverse the order of the Office of Hearings and Appeals as it applies to fiscal years 1976 and 1977.

ORDER

Now, March 17, 1983, the order of the Department of Public Welfare, Office of Hearings and Appeals, dated September 4, 1981, as it applies to Lancaster County, is affirmed with respect to 1975 and reversed with respect to 1976 and 1977.