514 A.2d 661

Tressler Lutheran Service Associates, Inc., t/a Ohesson Manor, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Tressler Lutheran Service Associates, Inc., t/a Susquehanna Lutheran Village, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Tressler Lutheran Service Associates, Inc., t/a Locust Grove Retirement Village, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Tressler Lutheran Service Associates, Inc., t/a Buffalo Valley Lutheran Village, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Tressler Lutheran Service Associates, Inc., t/a Frey Village, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

280

Argued May 12, 1986, before Judges MACPHAIL and COLINS, and Senior Judge BARBIERI, sitting as a panel of three.

*J. Jay Cooper, Goldberg, Evans & Katzman, P.C.,* for petitioners.

*William D. Lenahan,* Assistant Counsel, with him, *Bruce Baron* and *Jeffrey Gonick,* for respondent.

OPINION BY JUDGE MACPHAIL, September 3, 1986:

Tressler Lutheran Service Associates, Inc. (Petitioner) has appealed from orders of the Department of Public Welfare (DPW) which denied in part Petitioner's appeal from DPW's audit adjustments disallowing reimbursement regarding its Office of Public Information and DPW's offset of investment income earned in its Cash Management Office against interest on capital indebtedness borne by its various nursing facilities. We will affirm.

Petitioner appealed from DPW's Statement of Allowable Cost for each of its facilities for the fiscal year ending December 31, 1981.[1] Petitioner alleged, *inter alia:*

> The home office expenses of the President's Office and Public Information can be shown to be allowable expenses to the facility.
>
> . . . .
>
> The interest income received by the home office relates to the effectiveness and prudence of their business decisions on the entire Agency's operations. This interest income should be used to reduce the home office expense, which will benefit all areas of the Agency, rather than only those portions of operation that have capital indebtedness.

Hearings concerning Petitioner's Buffalo Valley Lutheran Village and Locust Grove Retirement Village were held on August 29, 1983 and September 22, 1983 respectively. The parties agreed that the records

---

[1] The facilities in question are Ohesson Manor, Susquehanna Lutheran Village, Locust Grove Retirement Village, Buffalo Valley Lutheran Village, and Frey Village.

developed in these two appeals would be representative of the issues involved for all five appeals.

The hearing examiner resolved the aforementioned issues against Petitioner.[2] The Office of Hearings and Appeals adopted the hearing examiner's decisions in their entirety, and the instant appeals followed.[3]

DPW's Medical Assistance Program Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual), 8 Pa. B. 2833 (1978) provided, at that time, that "[a]llowable costs are those costs necessary and reasonable for the proper care of Medical Assistance patients."

The hearing examiner found the following facts relative to the Office of Public Information:

The Department disallowed costs associated with the Office of Public Information.

The Office of Public Information distributes three newsletters:

(a) *TLSA Now*—published four times a year and deals with TLSA [Petitioner] as a whole and provides information about what TLSA is doing;

(b) *TLSA Notes*—published two times a year and is geared toward pastors; and

(c) Newsletters—published monthly for each of TLSA's nine facilities and deals with events within the individual facilities.

In the "Discussion" portion of her decision, the hearing examiner stated:

The provider explained that the primary function of the Office of Public Information is

---

[2] The recommended decision, however, did sustain Petitioner's appeals with respect to issues not appealed from here.

[3] On May 23, 1984, Petitioner timely filed separate Petitions for Review, raising identical issues with respect to the five facilities. By order of this Court dated November 20, 1984, we granted Petitioner's Motion to Consolidate.

the publication of various newsletters. . . . The provider maintains that these newsletters provide information to residents and their families regarding what is happening at the facility and provide a psychological boost to the residents.

. . . .

Although the patients in TLSA facilities may occasionally derive some psychological benefit from the monthly newsletter for the individual facilities, the provider has failed to convince the Hearing Officer that the newsletters are in any way related to patient care.

Petitioner submits that the newsletters are patient related, pointing out that on cross-examination, DPW's witness admitted that the newsletters were in fact related to patient care.

Our review of the record reveals that although DPW's witness conceded that the publications which dealt with the specific facilities and were made available to the patients and their families were related to patient care, that same witness was of the opinion that the costs associated with the Office of Public Information were not reimbursable because they constituted advertising:

Q: What do you mean by 'advertising'? Disallowed cost related to Public Information. Doesn't all Public Information in a sense sort of result in advertising? Isn't advertising the dissemination of information?

A: Yes, in a broad sense, advertising is a dissemination of information, but also it has connotations of publicizing the services in order to get patients or to let people come and utilize the services of the facility involved.

. . . .

Q: There are people associated with the Lutheran Church who might be interested in

knowing that there is a Lutheran Home available.

A: They can know that. We won't reimburse for that. We are not saying you are not allowed to advertise. You can tell whoever you want what services are available. We are saying for Medicaid purposes, it is not reimbursable cost.

Q: To the extent you are saying something is advertised?

A: Yes.

. . . .

Q: How do you portion [sic] something that you say is advertising versus something which is not?

A: If it is just for the people who are already in the facility, letting them know there is a festival or there is going to be a change in beds or a section of the facility is going to be shut down, this is not advertising. It is informing them what to do. *The responsibility of the provider is to demonstrate to us which costs are related to disseminating information about what is going on within the facility and what we would consider advertising.*

. . . .

Q: Specifically, what items of Public Information do you think are not proper items of reimbursement?

A: I can't remember all the different names of the publications. The newsletters that go out to congregations and the pastors and the other people who are on mailing lists outside of the facility or immediate families of people already in the facility, I would consider advertising.

Q: Even though, without getting into how many occasions, even though those publications

do deal with Medicaid patients or issues or things like that?

A: I do not see that as related to patient care.

I see that as advertising.

(R.R. at 104a-107a; emphasis added).

Our scope of review from orders of DPW is limited to a determination of whether an error of law was committed, constitutional rights were violated, or findings of fact were unsupported by substantial evidence. *Klingerman Nursing Center, Inc. v. Department of Public Welfare,* 73 Pa. Commonwealth Ct. 470, 458 A.2d 653 (1983). An agency's interpretation of its regulations is controlling unless it is clearly inconsistent with the underlying statute or with other regulations. *Department of Public Welfare v. Forbes Health Systems,* 492 Pa. 77, 422 A.2d 480 (1980). In the instant case, Petitioner failed to establish the percentage of reimbursement to which it claimed it was entitled. *See Northwestern Institute of Psychiatry v. Department of Public Welfare,* 99 Pa. Commonwealth Ct. 213, 513 A.2d 495 (1986). Accordingly, we do not believe that the hearing examiner erred in concluding that costs associated with the Office of Public Information were not reimbursable as related to patient care.[4] Therefore, we will affirm the DPW orders with respect to this issue.

We now turn to the issue of whether DPW properly offset Petitioner's interest income against the capital interest expenses borne by each of the five facilities. The applicable Manual regulations at that time provided, in pertinent part that "[i]nterest expense reduced by investment income, except when the investment income

---

[4] Petitioner did not allege that a cost-breakdown of the newsletters' expenses was available so that upon audit, DPW could readily determine that portion of expenses dealing with each facility's dissemination of information to its patients.

is derived from gifts or grants which are restricted by the donor and which are accounted for separately from other funds, will be recognized." Section IV(D)(10)(e)(5) of the Manual, 8 Pa. B. 2837 (1978).

In *The Odd Fellows Home of Pennsylvania v. Department of Public Welfare,* 56 Pa. Commonwealth Ct. 115, 424 A.2d 961 (1981), this Court noted that the clear import of Section IV(D)(10)(e)[5] was that "the amount of interest expense to be reimbursed is to be reduced by the amount of investment income earned by the *care provider,* except where the investment income is derived from gifts or grants which the donors have restricted." *Id.* at 117-18, 424 A.2d at 963 (emphasis added).

With respect to the interest offset issue, the hearing examiner found the following facts:

> The Department offset investment income earned in the home office of TLSA against interest on capital indebtedness reported on the facility's cost report.
>
> The investment income was generated by the Cash Management Office of TLSA and came from gifts and grants resulting from social service activities.
>
> The nursing facility does not generate any money for investment by the Cash Management Office.
>
> Investment income generated by the Cash Management Office is not made available to reduce capital indebtedness for the nursing facility.

In the "Discussion" portion of the decision, the hearing examiner reasoned as follows:

> The provider submits that since the interest income is generated by the home office and not

---

[5] The regulation referenced in *Odd Fellows* was found at 5 Pa. B. 2928 (1975) and is identical to the version at issue in the matter now before us.

the facility, the interest income should be offset by the home office expenses incurred in generating the income. The facility stated that regulations cover a typical situation and TLSA has an atypical situation outside the normal realm covered by regulations.

The absence of a regulation addressing a specific situation does not mean that the stated regulations do not apply. Regulations provide that interest expenses are to be reduced by interest income. Manual IV-D-10-e. No evidence was provided to show that the interest income was exempt from offset; *i.e.*, restricted or not commingled. Therefore, the Department acted in accordance with stated regulations in offsetting investment income against interest on capital indebtedness.

Petitioner submits that because the interest income is earned on funds in its Cash Management Office and not on funds held by the separate facilities, the money on which the interest is earned is not available to the facilities, and DPW erred in making the offset calculation. Alternatively, Petitioner argues that should we determine that DPW properly offset the interest income, "fairness would dictate that [P]etitioner be allowed to reduce the income by the costs incurred in generating that income." Petitioner's Brief at 26.

DPW offset the interest earned in Petitioner's Cash Management Office against each facility's interest on capital indebtedness because it determined that the interest earned by Petitioner, as the parent corporation for each of the facilities, was available investment income to each of the facilities.

In *Odd Fellows*, DPW had reduced the Home's allowable or reimbursable interest expense by the amount of investment income which the Home realized

from several funds *under its control.* 56 Pa. Commonwealth Ct. at 117, 424 A.2d at 963. In rejecting the Home's general arguments that the income should not have been used as an offset of the allowable interest cost under Section IV(D)(10)(e) of the Manual, this Court observed:

> The income generating funds, five in number, were established by the Home's corporate by-laws. The by-laws also prescribe the purposes for which the principal may be expended . . . Section IV 10(e)[6] of the Manual by its terms narrows the source of restriction to the *donor himself.* That clearly means restriction directly and expressly imposed by *the donor* as a condition of his gift or grant.
>
> There is not room under the narrow terms of the Section for a process of imputing to a donor an imagined adoption of restrictions contained in independent sources. To accept the appellant's argument would permit any such organization to avoid the reduction mandated by Section IV 10(e), through the simple expedient of declaring in its by-laws the purposes for which various funds might be used.

56 Pa. Commonwealth Ct. at 119, 424 A.2d at 963-64 (emphasis in original; footnote omitted).

In *County of Lancaster v. Department of Public Welfare,* 72 Pa. Commonwealth Ct. 639, 457 A.2d 1000 (1983), this Court reversed DPW's determination that the county home had investment income to be offset by interest on capital indebtedness under Section IV-(D)(10)(e) of the Manual. In *County of Lancaster,* Judge CRAIG noted:

---

[6] For purposes of convenience, Section IV(D)(10)(e) of the Manual was referred to as Section IV 10(e) in *Odd Fellows.*

Also relevant is the facst that Lancaster County maintains a centralized accounting system. The county deposits all its monies in a general fund, and it makes all disbursements from that single account. Because of its use of the pooled general fund, the county is able to purchase interest-bearing certificates of deposit and reduce the cost of county government to the taxpayers.

DPW contends that, because the funds which the County Commissioners had earmarked for the county home . . . were included in the general fund, a portion of the interest earned was investment income attributable to the home. The county argues that the home operated at a constant deficit, and because . . . a deficit cannot earn interest, the home did not generate any investment income.

. . . .

We cannot fairly assign to the county home any investment income arising from principal *not controlled by, or otherwise attributable to,* the county home.

72 Pa. Commonwealth Ct. at 643-46, 457 A.2d at 1002-1003 (emphasis added; footnote omitted).

The principles we extrapolate from *Odd Fellows* and *County of Lancaster* may be summarized as follows: in determining whether interest expense should be reduced by investment income under Section IV(D)(10)(e) of the Manual, (1) there must be investment income earned by the care provider, (2) the investment income must be controlled by or otherwise attributable to the facility in question and (3) the amount of investment income restricted by the donor will not be used to reduce the amount of interest expense to be reimbursed.[7]

---

[7] In *Chateau Convalescent Center v. Department of Public Welfare,* 90 Pa. Commonwealth Ct. 426, 495 A.2d 659 (1985), this

The record here reveals that the investment income is "earned" through Petitioner's Cash Management Office and derives primarily from Petitioner's Church and Community Services Division, not the Nursing Home

Court applied the current Manual provisions found at 55 Pa. Code §§1181.201-1181.274 to determine whether Chateau's reimbursable interest on capital indebtedness expense was properly offset against Chateau's investment income for the fiscal year ending March 31, 1980. We note that the regulations contained at Sections 1181.201-1181.274 did not become effective until July 1, 1983. Although it would seem that these current provisions were not applicable to the fiscal year in question, this issue was not raised in *Chateau Convalescent Center*. We are applying the regulations that were in effect in 1981 to the case *sub judice*.

Of interest, however, are the definitional provisions found at 55 Pa. Code §1181.202, which provide the following:

*Facility*—A county or general nursing facility that is enrolled in the Medical Assistance Program.

. . . .

*Interest on capital indebtedness*—The direct cost incurred for funds borrowed for capital purposes. Examples are acquisition of facilities, equipment and capital improvements. Generally, loans for capital purposes are long term loans.

. . . .

*Investment income*—Actual or imputed income available to or accrued by a facility from funds which the facility invests or lends or which are held by others for the benefit of the facility.

. . . .

*Related party*—An individual or organization that is associated or affiliated with, or *has control of* or is controlled by, the provider. '*Control', as used in this definition, means the power to influence or direct the actions or policies of another* (emphasis added).

In *Chateau Convalescent Center*, we observed that:

Section 273(a) of the Manual, 55 Pa Code §1181.273(a), provides in pertinent part that: 'Any form of investment income from the use of unrestricted funds will be used to reduce the allowable interest on capital indebtedness first,

Division. Petitioner's Executive Director of the Office of Finance and Business Services testified to the following:

> A: [T]he money that was available for investment does not come from the nursing homes alone. As a matter of fact, the majority would come from sources other than the nursing homes because of our extensive social service involvement. These programs receive their money in large grants, whereas the nursing homes are paid after the fact for services they render, thereby giving very little money available for investment from the nursing operations themselves.
>
> Beyond that, the money was earned as a function of the central office or Central Agency

---

then other interest.' 'Investment income' is defined as 'Actual income available to or accrued by a *facility* from funds which *the facility* invests or lends or which are held by others for the benefit of *the facility*.' 55 Pa. Code §1181.202 (emphasis added). Thus, according to these provisions, [t]he amount of interest expense to be reimbursed is to be reduced by the amount of investment income earned by the facility, in this case Chateau. See Odd Fellows Home of Pennsylvania v. Department of Public Welfare, 56 Pa. Commonwealth Ct. 115, 424 A.2d 961 (1981). Nowhere in the Manual [as codified] is it stated that investment income to a party related to a care provider under the [Medical Assistance] Program is to be deemed income to the provider.

90 Pa. Commonwealth Ct. at 430, 495 A.2d at 661 (footnote omitted). In *Chateau,* DPW not only treated the interest payment as a non-allowable cost but also deducted the same amount from the interest on capital indebtedness as investment income to Chateau, even though the real beneficiary of the income was Bryn Mawr Joint Venture—a *related* party. In the case *sub judice,* there is no related party but rather just one corporation—Petitioner—which owns and operates the five nursing homes involved in these appeals.

program, namely cash management. Were this program not to exist, the money itself would not · exist without the program.

. . . .

Q: What type of records or information do you have which would create your classification of investment income on capital as income earned on the capital contributions?

A: As individual contributions are received from the individual facilities, we get the actual checks or cash and a receipt or document from the administrator or a letter from the donor telling us what is to be done with the money.

. . . .

Q: Is this kept in separate accounts or—

A: It is kept in separate accounts. Individual records are maintained by the facility, and as the money is utilized, the ledgers are adjusted.

Q: [W]hat is that money [interest income from investment income] used for?

A: That money is used throughout the year to fund the operations of the Department of Cash Management. It is funded by the income it generates.

Q: Is the money which is earned in that area available to reduce capital indebtedness?

A: No. It is temporary access [sic] cash that is utilized throughout the year as the program spends it up.

(R.R. at 84a-86a).

We believe that the fact that the nursing homes themselves did not generate the funds on which the interest was earned (R.R. at 131a) is not dispositive. Petitioner is the care provider. Its operations are funded by donations and grants, and it is Petitioner which allocates the funds in the Cash Management Office. Inasmuch as

Petitioner owns and operates each of the facilities in question, the investment income attributable to the Cash Management Office is also attributable to each of the facilities.

We emphasize that here we have one corporation, Petitioner, with distinct divisions, one of which is the nursing home division. The divisions may operate autonomously but are actually operationally inseparable. The internal operating procedures of the Petitioner should not be used to increase reimbursement from the public fisc. In other words, unless the investment income is clearly earmarked as donor restricted, *Odd Fellows*,[8] DPW did not err in offsetting the investment income.

Petitioner argues in the alternative that if the investment income is offset, DPW should at least give it a credit for expenses incurred in generating that income. We disagree. There is nothing in the regulations that would authorize a deduction for expenses incurred in generating the investment income. Likewise, there is no authority to credit expenses incurred in generating the investment income before reducing interest income.

Having found no errors of law, violations of constitutional rights or findings of facts unsupported by substantial evidence, we affirm.

ORDER

The orders of the Department of Public Welfare in the above-captioned cases are affirmed.

---

[8] Funds designated by the Board for specific purposes (R.R. at 95a) do not qualify as donor restricted. No donor restricted funds were used in the offset calculation. R.R. at 94a-95a.