521 A.2d 524

Moravian Manors, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Insurance Department, Respondent.

Argued November 17, 1986, before Judges MAC-
PHAIL, DOYLE and COLINS, sitting as a panel of three.

*Robert W. Hallinger, Barley, Snyder, Cooper & Bar-
ber,* for petitioner.

*Jean M. Callihan,* Assistant Counsel, with her, *M.
Hannah Leavitt,* Chief Counsel, for respondent.

*Matthew M. Strickler,* with him, *Mary E. Bates,
Ballard, Spahr, Andrews & Ingersoll,* for intervenors.

OPINION BY JUDGE COLINS, February 25, 1987:

Moravian Manors (petitioner),[1] a non-profit corpora-
tion operating a retirement community, appeals an or-

---

[1] *Amici curiae* before this Court are the Lutheran Church in
America (LCA), the Northeastern, Southeastern and Central
Synods of the LCA, respectively, Tressler Lutheran Service Associ-
ates and Germantown Home.

der of the Insurance Commissioner (Commissioner) affirming the determination of staff that petitioner is a continuing care provider subject to the provisions of the Continuing Care Provider Registration and Disclosure Act (Act), Act of June 18, 1984, P.L. 391, 40 P.S. §§3201-3225. We must determine whether the Commissioner's decision manifests an error of law, an abuse of discretion or whether any findings of fact are unsupported by substantial evidence. *See* Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704.

The pertinent facts are not in dispute. Petitioner operates a retirement community consisting of a skilled and intermediate care nursing home, and independent cottages and apartments. Upon admission to the facility, residents enter into a residence agreement (contract or agreement) with petitioner and pay an entrance fee[2] ranging from $79,000 for the right to occupy an apartment and $85,000 for accommodations in a cottage. Residents are then required to pay a monthly maintenance charge of $200 to $250, again dependent upon the type of accommodations. This monthly fee covers maintenance of grounds, building exteriors and common areas, snow and trash removal and consultation with a nurse on health care matters. Petitioner provides a communal dining room where residents may purchase meals at their discretion.[3] Residents may also, at their

---

[2] The entrance fee is a capital contribution distributed by petitioner as follows: 40% of this fee for endowment, 40% for development and 20% towards depreciation and/or a fund for major improvements. The Board of Trustees intends that 80% of all entrance fees will be earmarked for endowment once development· of the facility is completed. No portion of the fee is reserved for the care of the individual.

[3] The agreement states that residents "shall provide their own food" and petitioner's representatives testified that none of the cottage or apartment residents purchase meals from the facility on a regular basis.

discretion, avail themselves of the community health care facility on a fee-for-service basis. Residents and non-residents of the community are billed for nursing and health services at the same rate. The agreement also contains the following provision: "Health Center facilities and residential living will continue to be available to a resident even if he, she or they are financially unable to pay such charges, provided that resident provides documentation to [petitioner] of such financial inability to pay."

On April 15, 1985, petitioner was notified that it had been determined to be a continuing care provider and was directed to apply for a certificate of authority as required by Section 4 of the Act, 40 P.S. §3204.[4] Petitioner appealed this determination to the Commissioner and, after hearings,[5] the Commissioner issued the order and decision which we now review.

Upon careful consideration of the subject agreement and other record evidence, the Commissioner found that petitioner "promises to provide board, lodging and health services to its residents, for the life of the individual [r]esident, in consideration of the resident's payment of an entrance fee" and thereby held petitioner subject to the Act. The Commissioner concluded that residents enter the facility with the "reasonable expectation" that they will receive board, lodging and health services for the remainder of their lives regardless of their subsequent inability to pay for these services.

---

[4] 40 P.S. §3204(a) states that: "[n]o providers shall engage in the business of providing continuing care in this Commonwealth without a certificate of authority therefor obtained from the commissioner as provided in this act."

[5] Three other appeals by comparable fee-for-service providers from similar determinations were consolidated with petitioner's appeal for hearings before the Commissioner.

The sole question we must determine is whether petitioner is a continuing care provider as that term is defined in Section 3 of the Act, which provides:

> Continuing Care. The *furnishing to an individual,* other than an individual related by consanguinity or affinity to the person furnishing such care, of *board and lodging together with nursing services, medical services or other health-related services . . . in consideration of the payment of an entrance fee with or without other periodic charges.* (Emphasis added.)

40 P.S. §3203.

Petitioner contends that it furnishes lodging alone in consideration of the entrance fee and that provision of meals and medical care on a fee-for-service basis precludes its designation as a continuing care provider as above defined. Petitioner also argues that the Commissioner's designation of its facility as a continuing care provider is not supported by the legislature's intent in enacting the Act. That purpose is succinctly stated in Section 2 of the Act as follows:

> The General Assembly recognizes that continuing-care communities have become an important and necessary alternative for the long-term residential, social and health maintenance needs for many of the Commonwealth's elderly citizens.
>
> The General Assembly finds and declares that tragic consequences can result to citizens of the Commonwealth when a provider of services under a continuing-care agreement becomes insolvent or unable to provide responsible care. The General Assembly recognizes the need for full disclosure with respect to the terms of agreements between prospective residents and the provider and the operations of such providers.
>
> . . .

40 P.S. §3202.

The Act thus articulates a definite legislative mandate to assure the financial solvency of continuing-care communities and provides a comprehensive regulatory system for so doing, *see* Sections 4 through 23 of the Act, 40 P.S. §§3204-3223, including the imposition of criminal penalties for violations of same. 40 P.S. §3222.

Petitioner argues that critical to our determination is a distinction between so-called "life care" communities and a fee-for-service provider such as itself, and contends that the Act is only intended to regulate the former. A life care provider furnishes board, lodging and all necessary health services upon payment of an entrance fee and fixed monthly fees. *See* Comment, *Continuing-Care Communities for the Elderly: Potential Pitfalls and Proposed Regulation*, 128 U. Pa. L. Rev. 883 (1980).

The Act, however, does not distinguish between life care and fee-for-service providers, nor do we believe that the statutory language demonstrates an intent to be so narrowly construed. Indeed, we concur in the Commissioner's determination that while petitioner's residence agreement contains a statement that the agreement is not intended to constitute an undertaking or contract, express or implied, to care for the resident for life, this disclaimer is eroded by other contractual provisions.

In this regard we are persuaded, as was the Commissioner, by the contractual provision that "[H]ealth center facilities and residential living *will continue to be available to a resident even if he . . . [is] financially unable to pay. . . ."* (Emphasis supplied.)

Petitioner contends that the Commissioner's decision distorts an incidental contingency for resident subsidization by petitioner into a contractual obligation. Petitioner argues that certain factors mediate against such a characterization, these factors being: (1) the agreement requires residents, upon insolvency, to seek alternate

sources of assistance, be it private, state, federal or municipal aid; (2) the agreement provides for a restriction on transfer of assets and repayment from a resident's estate in the event of subsidization of the monthly maintenance fee; and (3) none of the residents has become unable to meet its financial obligations.

We are not persuaded that any of these factors bears upon the expectations of applicants upon entering into the residence agreement. The minimum age of applicants for admission is 62 years. An applicant expends a substantial sum of money in payment of the entrance fee, a sum which, in many cases, constitutes the majority of an individual's life savings. The availability of on-site health care is obviously an inducement to application. While applicants understand there is a specific additional charge for meals and health care services, they also understand that they must pay these charges *only as long as* they are financially able to do so.

In consideration of the contractual language, we believe residents expect to receive board, lodging and all necessary medical care in consideration of the entrance fee, regardless of their subsequent financial status. Quite simply, we believe they anticipate receiving such care for the remainder of their days. The fact that none of the residents has been forced to rely on the contractual insolvency provisions indicates only petitioner's rigorous screening of applicants in terms of their financial status. These provisions remain an obligation on the part of petitioner.

We are not persuaded that the Act is applicable solely to life care providers and that fee-for-service providers, such as petitioner, are beyond its scope. The Act intends to avoid the "tragic consequences" of provider insolvency. 40 P.S. §3202. Residents of petitioner's community have no long-term equity[6] in their residen-

---

[6] The Commissioner found that residents occupying independent living units retain a declining equity in their units as follows:

tial units, despite the substantial entrance fee paid for the privilege of occupying such accommodations. Upon provider insolvency, residents would effectively forfeit the entrance fee and lose all benefits accruing under the contract, including their right to habitable shelter, to purchase meals in the communal dining hall, to purchase health care services and, most significantly, the contractually guaranteed right to continued accommodation, board and medical care despite their own financial inability to pay additional charges. We fail to comprehend how these losses comprise a less tragic scenario than one envisioned upon the insolvency of a life care community, as that term is utilized in the traditional sense.

We finally consider petitioner's contention that the legislature's reference to "other periodic charges" in the statutory definition of continuing care, 40 P.S. §3203, manifests an intent to exclude fee-for-service providers from the Act's coverage. Petitioner submits that occasional fee-for-service charges are not periodic charges under the Act because such charges are billed only if a resident chooses to purchase a particular service.

The Act does not define periodic charges but the pertinent regulation at 31 Pa. Code §151.2 defines "period[ic]" as "a charge payable under a resident's agreement which is assessed on a recurring basis, such as a monthly fee."

We are not constrained to limit the language "other periodic charges" to monthly fees, although such fees are encompassed by those terms. The Act clearly contemplates additional charges for services not covered by

---

At the end of four years, $10,000 is returned to the resident of the cottage upon vacating the unit; $25,000 is returned to the resident of a one bedroom apartment and $30,000 is returned to the resident of a two bedroom apartment.

the entrance fee. For example, Section 7(a)(6) of the Act, 40 P.S. §3207, requires disclosure of "which services are included in basic contracts for continuing care and which services are made available at or by the facility *at extra charge.*" (Emphasis supplied.)

Given the purpose of the Act, we are not convinced that fee-for-service charges could not be encompassed by the term "periodic charges." We need not reach that question, however, because, in consideration of the subject agreement read in its entirety, we hold that petitioner furnishes board, lodging and medical care to its residents in consideration of an entrance fee.

Accordingly, the order of the Commissioner is affirmed.

## ORDER

AND NOW, February 25, 1987, the order of the Insurance Commissioner, dated January 31, 1986, in the above-captioned matter is affirmed.