545 A.2d 956

Messiah Village, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

30

Argued April 18, 1988, before Judges CRAIG and COLINS, and Senior Judge KALISH, sitting as a panel of three.

*J. Jay Cooper, Goldberg, Katzman & Shipman, P.C.*, for petitioner.

*Mary Frances Grabowski,* Assistant Counsel, for respondent.

OPINION BY JUDGE COLINS, July 19, 1988:

Messiah Village (petitioner) appeals from an order of the Department of Public Welfare, Office of Hearings and Appeals (DPW), which denied petitioner's appeal from audit adjustments made to the Medicaid Cost Report filed by petitioner for the year ending June 30, 1984, for its skilled nursing facility.

Petitioner's appeal challenged the propriety of DPW's offset of interest income earned by petitioner's Endowment Fund, Residential Liability Reserve Fund (Reserve Fund), and Charitable Gifts Annuity Fund (Annuity Fund), against interest expense reported by the petitioner for its nursing facility. A hearing on petitioner's appeal was held on November 12, 1986 before Mark S. Fenice, Hearing Attorney. Petitioner's sole contention was that the investment income and the funds from which this income was generated were donor restricted; and, therefore, exempt from offset pursuant to Section 1181.260(h)(1) of the regulations governing nursing care facilities, found at 55 Pa. Code §1181.260(h)(1).

The evidence presented at petitioner's hearing indicated that DPW offset $64,910 of investment income which was generated by three funds held by the petitioner: the Endowment Fund, the Annuity Fund and the Reserve Fund. This investment income was comprised of only the interest which was earned on the

funds during the reported period and not the principal balance of the funds.[1] Because the issues in this matter center on the characterization of these funds, we feel it necessary to discuss each fund separately as set forth below.

## THE RESERVE FUND

Petitioner's Reserve Fund consists of funds held by petitioner to meet its financial obligations under its cluster housing agreements. Under these agreements, persons purchase the right to occupy residential housing owned by petitioner for a period of time until they die or permanently change their status, for instance becoming a patient in a nursing facility. Under the agreement, the individual pays the petitioner an acquisition cost.[2] During the first year of occupancy, ten percent (10%) of the acquisition cost accrues to the petitioner. Thereafter, during the second through the ninth years, an additional five percent (5%) accrues to the petitioner each year. We note that at least one-half of the acquisition cost always remains as equity to the resident or his estate, that equity being refunded to the resident should he leave petitioner's facility or to his estate upon his death. In 1984, had all residents of the cluster arrangement either died or changed their status, petitioner would have had a liability of $3.4 million, although the monies contained in the Reserve Fund totalled only

---

[1] DPW concluded that the total amount subject to offset for these three funds was $103,110.00, consisting of $66,087.00 from the Endowment Fund, $15,465.00 from the Annuity Fund, and $21,558.00 from the Reserve Fund. Due to the fact that petitioner had already offset income of $38,200.00 on its cost report for alternative reasons, the net offset made by DPW was $64,910.00.

[2] In 1984, the acquisition cost of a cluster housing unit averaged $48,000 to $54,000. This acquisition cost increased to an average cost of $69,500 in 1986.

$215,000. The Reserve Fund is maintained to pay the expected return equity due the residents of petitioner's cluster housing units.

It is petitioner's contention that this fund exists solely to meet its obligations unrelated to the operation of its nursing facility. In addition, petitioner maintains that this fund is restricted by the cluster agreement itself, the surrounding circumstances, and the donors, such that it is exempt from offset, even if it generates income. DPW maintains that petitioner does not consider the acquisition cost of the cluster unit to be a gift to the nursing facility. Moreover, there is no language contained in the cluster housing agreement executed between the parties which restricts either the proceeds paid to the petitioner at acquisition or any interest income earned thereon for use in the Reserve Fund for any other specified purpose. Petitioner's nursing home and cluster housing units are maintained by the same corporate entity. For all of these reasons, DPW contends that the principal balance of this fund does not consist of gifts or donations and that any restrictions on the principal or any income generated thereon were established not by the residents of the cluster housing units, but by petitioner.

## THE ANNUITY FUND

Petitioner's Annuity Fund consists of monies donated by individuals, not necessarily residents of petitioner's facility, who, in consideration of their donation, receive an annual payment for the remainder of their lives. These cash donations are considered as tax deductible gifts at the time of giving and the money is maintained in the Annuity Fund during the donor's lifetime. Upon the death of the donor, the petitioner's obligation to pay the annuity ceases and the donor's contribution is transferred to the Endowment Fund or put to

use according to the discretion of the petitioner's Board. The annuity payments made to the donors are derived from the interest income generated by the Annuity Fund. Any expense income generated in the Annuity Fund remains therein. We note that in 1984 the Annuity Fund had growth income of $15,465.00 and the amount paid out by the fund was $9,640.00. Since that time, because of interest rate changes, payments have exceeded income earned on the fund.

Petitioner alleges that DPW committed error in offsetting the gross income earned on the total amount funded against interest expense reported for petitioner's facility without subtracting the amount paid out to the donors. Petitioner notes that although the funds are held by the facility, the funds are not available for use by the facility or any other purpose of petitioner during that time. In response, DPW points out that the Charitable Gift Annuity Agreement (Annuity Agreement) signed by a donor contains no language which would restrict the income generated by the donor's gift to payment of annuities or which would restrict excess interest income accruing to the Annuity Fund. The Annuity Agreement which was offered into evidence by petitioner indicates that the principal of the gift is designated for the Endowment Fund and *not* the Annuity Fund. Therefore, DPW alleges that the evidence and testimony presented demonstrates that any restrictions on the Annuity Fund and income generated thereon were established *not* by the donor, but rather by petitioner, and therefore should be subject to offset.

## THE ENDOWMENT FUND

Petitioner's Endowment Fund consists of monies contributed to the facility which are then invested by petitioner in Certificates of Deposit, stocks, and bonds which yield approximately ten percent in interest and

dividends. This fund exists for the express purpose of providing financial assistance to persons with financial need who are unable to pay for the full costs of care at petitioner's facility. The principal of the Endowment Fund is not expended, but the income generated thereon is used, at the discretion of petitioner's Board, to compensate for the operational costs involved in providing benevolent services.

Petitioner presented testimony that the monies placed in the fund were derived from donors who specifically directed that the money be deposited into the Endowment Fund. Each gift to this fund was acknowledged in writing by the petitioner. Also presented were the pledge cards of the donors indicating that the funds were to be donated to the Endowment Fund. In its testimony, petitioner acknowledged that part of the principal contained in the Endowment Fund consisted of donations by the petitioner's Board. The petitioner could not identify the percentage of donations generated by this type of general donation. The record indicates that the Endowment Fund, as well as the other two funds at issue, are kept at separate banks and separate accounts are maintained on each fund.

Petitioner maintains that the monies comprising the Endowment Fund are restricted by the donor as evidenced by the designation on the pledge card so indicating. DPW counters this argument by alleging that the pledge cards did not contain any language indicating that the donors restricted the interest generated by their donations to any specific purpose. DPW emphasizes that an *indeterminate* portion of the principal balance of the Endowment Fund consists of gifts made specifically to that fund. DPW contends, therefore, that any restrictions on the Endowment Fund and income generated thereon were established not by the donors, but by petitioners, and should be subject to offset.

## DISCUSSION

Initially, we note that our scope of review in this matter is limited to a determination of whether DPW committed any errors of law, violated any constitutional rights, and whether its findings of facts are supported by substantial evidence. *Tressler Lutheran Service Associates, Inc. v. Department of Public Welfare,* 100 Pa. Commonwealth Ct. 279, 514 A.2d 661 (1986). We shall address the issues presented by petitioner, keeping in mind that an agency's interpretation of its regulations is controlling unless it is clearly inconsistent with the underlying statute or with the regulation itself. *Department of Public Welfare v. Forbes Health System,* 492 Pa. 77, 422 A.2d 480 (1980).

Petitioner's first contention is that the income earned by the three funds at issue is not investment income attributable to or available to petitioner's facility. As defined in the regulations governing nursing facility care, found at 55 Pa. Code §1181.202, investment income is:

> Actual or imputed income available to or accrued by a facility from funds which the facility invests or lends or which are held by others for the benefit of the facility.

Section 1181.260(a) of these regulations provides that, subject to enumerated conditions, "[n]ecessary and proper interest on capital and current indebtedness is an allowable cost." 55 Pa. Code §1181.260(a). Section 1181.260(h), states further:

> Investment income shall be used to reduce allowable interest expense on capital and current indebtedness unless the investment income is from either:
>
> (1) Gifts or grants, of which the corpus and interest are restricted by the donor;

(2) Funded depreciation, if the interest earned remains in the fund; or

(3) The facility's qualified pension fund, if the interest earned remains in the fund.

Petitioner further contends that the funds in question are "donor restricted" and, therefore, should be exempt from offset pursuant to 55 Pa. Code §1181.260(h)(1).

Initially, we must conclude that DPW was correct in determining that the monies in the Endowment Fund and the Annuity Fund were investment income available to petitioner.[3] In *Tressler*, this Court determined that the principles to be applied in determining whether interest expense should be reduced by investment income are as follows:

(1) there must be investment income earned by the care provider, (2) the investment income must be controlled by or otherwise attributable to the facility in question and (3) the amount of investment income restricted by the donor will not be used to reduce the amount of interest expense to be reimbursed. (Footnote omitted.)

*Id.* at 289, 514 A.2d at 666.[4] In upholding DPW's offset of investment income, this Court stated:

---

[3] We are unable to conclude that the monies contained in the Reserve Fund are "available" to petitioner as our discussion within will illustrate.

[4] We note that *Tressler* was decided at a time in which the applicable regulations did not include the definition of investment income. However, this Court applied the *Tressler* rationale in its recent decision in *Northwood Nursing and Convalescent Home, Inc. v. Department of Public Welfare,* 110 Pa. Commonwealth Ct. 40, 531 A.2d 873 (1987) (although home office and nursing facility were separate corporations, home office had complete ownership and control of the nursing facility and therefore, DPW's decision to offset investment income earned by the home office against its nursing facilities' interest expense on capital indebtedness was not error).

[w]e believe that the fact that the nursing homes themselves did not generate the funds on which the interest was earned . . . is not dispositive. Petitioner is the care provider. Its operations are funded by donations and grants, and it is Petitioner which allocates the funds in the Cash Management Office. Inasmuch as Petitioner owns and operates each of the facilities in question, the investment income attributable to the Cash Management Office is also attributable to each of the facilities.

We emphasize that here we have one corporation, Petitioner, with distinct divisions, one of which is the nursing home division. The divisions may operate autonomously but are actually operationally inseparable. The internal operating procedures of the Petitioner should not be used to increase reimbursement from the public fisc. In other words, unless the investment income is clearly earmarked as donor restricted, . . . DPW did not err in offsetting the investment income. (Citation omitted, footnote omitted.)

*Id.* at 292-93, 514 A.2d at 667-68. Applying the rationale of *Tressler,* we must conclude that DPW did not err in its determination that the interest income earned by petitioner on the Endowment Fund and the Annuity Fund is investment income as defined by 55 Pa. Code §1181.202.

In order to establish that funds qualify for exemption under Section 1181.260(h)(1)[5] a provider must show both that the investment income was earned on

---

[5] Although there are three limited categories of exemption from offset under 55 Pa. Code §1181.260(h), the income in question does not fall within two of the categories. Therefore, we shall consider whether the income should be exempt from offset pursuant to 55 Pa. Code §1181.260(h)(1) only.

gifts or grants and that "the corpus of the gift or grant and the interest generated thereon were restricted by the *donor*." Having determined that the interest income earned on the Endowment Fund and Annuity Fund constitutes investment income, we now turn to the issue of donor restriction.

This Court has held that the restriction on the use of funds must be "directly and expressly imposed by *the donor* as a condition of his gift or grant." *Odd Fellows Home of Pa. v. Department of Public Welfare,* 56 Pa. Commonwealth Ct. 115, 119, 424 A.2d 961, 964 (1981). In that case, this Court also specifically rejected the argument that "because the Home's corporate by-laws restrict the Home's use of the funds, persons who made gifts or grants that went into those funds adopted the by-law restrictions and constructively attached them as restrictions on their gifts." *Id.* Applying the principle set forth in *Odd Fellows,* we shall now address separately whether the income earned on each fund is exempt from offset.

## THE RESERVE FUND

As previously noted, the Reserve Fund was created to fund equity returns to residents of petitioner's cluster housing units. Petitioner claims that by virtue of the cluster housing agreements executed between the parties, Messiah Village is a continuing care provider under this Court's recent decision in *Moravian Manors, Inc. v. Insurance Department,* 104 Pa. Commonwealth Ct. 206, 521 A.2d 524 (1987). In that case, we concluded that a retirement community consisting of a skilled and intermediate care nursing home, as well as independent cottages and apartments, was a continuing care provider under the Continuing-Care Provider Registration and Disclosure Act, Act of June 18, 1984, P.L. 391, 40 P.S. §§3201-3225. The retirement community fur-

nished board, lodging, and medical care to its residents pursuant to a resident agreement and the payment of an entrance fee. The resident agreement executed between the parties contained a provision stating that health care facilities and resident living quarters would continue to be available to a resident even in the event of the resident's inability to pay.

Petitioner points out that its agreement contains a similar provision. It asserts that the monies in the Reserve Fund, in addition to funding equity returns, are used to provide care to residents that are no longer able to pay for their own care. Therefore, petitioner concludes that these monies are not "available" for use by the petitioner and, consequently, should not be subject to offset. Petitioner's argument is persuasive but this analysis does not apply until DPW has made a determination of whether the petitioner is a continuing care provider. Therefore, we must remand the matter for such a determination under the *Moravian Manors* analysis.

## THE ANNUITY FUND

In reviewing the testimony surrounding this fund, the Hearing Attorney found that the money given by an annuitant under an Annuity Agreement was not actually a gift and was also not donor restricted, even if a gift. Petitioner asserts that the title of the Annuity Agreement and the fact that the payment is recognized as a gift by the Internal Revenue Service contradicts the Hearing Attorney's conclusion that these monies do not constitute gifts. Moreover, the petitioner contends that the gift is donor restricted by the very terms of the Annuity Agreement.

Our review of the Annuity Agreement reveals that it contains no language which restricts a gift or designates a gift to the Annuity Fund. The mere fact that petition-

er has a contractual obligation to make annuity payments to a person contributing to the Annuity Fund, does not automatically impose a direct and express *donor* restriction on the gift given. Finally, we must reject petitioner's contention that the annuity payments made to the donors must be considered in calculating the investment income earned by this fund. This Court rejected a similar argument in *Tressler,* noting that the regulations did not provide authorization for a deduction for expenses incurred in generating investment income. In addition, we found no authority in the regulations to allow the crediting of expenses incurred in generating investment income before reducing interest income. *Tressler.*

## THE ENDOWMENT FUND

Although the monies donated to this fund are in the form of gifts or grants, we cannot conclude from the evidence presented that there is a direct and expressed *donor* restriction on the principal of the fund or the interest derived therefrom. Petitioner indicated in its testimony that an indeterminate portion of the principal balance of this fund consisted of donations made to that fund. However, petitioner's testimony also indicated that its Board, and not the *donors,* designate the specific purposes for which the actual fund is used. Although the donor may specifically direct that his gift be put in a particular fund, the petitioner's Board, at its own discretion, may decide to change the purposes for which a fund is used. Arguably, under the mandate of *Odd Fellows,* the donor's designation of a specific fund to which his gift is made could be sufficient to restrict the corpus of the gift. However, the interest income generated on the gift is in no way restricted by the donor. To qualify for exemption from offset under 55 Pa. Code §1181.260(h)(1), both the corpus and the interest

derived from the fund must be restricted by the donor. The evidence is clear in this matter that there has been no showing that there is a direct and express donor restriction on the interest income earned on the Endowment Fund. Therefore, we must conclude that DPW did not err in its decision to reduce petitioner's interest expense on capital indebtedness by the income generated on this fund.

## ALLOCATIONS

Finally, petitioner maintains that DPW erred by failing to allocate the income earned on the three funds between Medicaid and non-Medicaid programs before calculating offset. Although we have concluded that DPW was correct in its decision to offset the income investment generated on the Endowment Fund and the Annuity Fund, we find error in DPW's failure to first allocate between the Medicaid and non-Medicaid programs provided by petitioner. In *Tressler*, DPW made such an allocation based upon the facility's operating expenses. In *Tressler*, 33% of the investment income generated was exempted from offset by DPW because 33% of the operating expenses was associated with non-nursing home activities. In the present matter, DPW did not allocate the investment income earned by petitioner between its Medicaid and non-Medicaid activities. We must, therefore, remand this matter for allocation and recalculation of offset.

## CONCLUSION

We must conclude that DPW did not err in its conclusion that income earned on the Endowment Fund and the Annuity Fund was subject to offset. However, we must remand this matter to DPW for a determination of whether the monies contained in the Reserve

Fund are unavailable to petitioner, because, as a continuing care provider, petitioner must use these funds to care for residents, regardless of their ability to pay. We must also remand for the allocation of investment income between petitioner's Medicaid and non-Medicaid programs prior to offset.

## ORDER

AND NOW, this 19th day of July, 1988, the Order of the Department of Public Welfare in the above-captioned matter is affirmed in part and vacated and remanded in part, in accordance with this opinion.

Jurisdiction relinquished.