**SYCAMORE MANOR HEALTH CENTER, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

**SYCAMORE MANOR HEALTH CENTER, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 7, 1995.

Decided July 27, 1995.

Thomas W. Scott, for petitioner.

Jeffrey P. Schmoyer, Asst. Counsel, for respondent.

Before SMITH and FRIEDMAN, JJ., and KELTON, Senior Judge.

SMITH, Judge.

Sycamore Manor Health Center (Sycamore), a 123–bed nursing facility owned and operated by Presbyterian Homes, Inc. (PHI), petitions for review of an order of the Secretary of the Department of Public Welfare (DPW) upholding on reconsideration an order of the Director of the Office of Hearings and Appeals that adopted the adjudication of an attorney examiner in Sycamore's challenge to DPW's disallowance of certain costs claimed as expenses reimbursable by DPW under the Pennsylvania Medical Assistance Program (Medicaid) for the years 1988 and 1989.[1]

The questions presented are: (1) whether DPW properly included certain money PHI received from various trusts as investment income to be offset against Sycamore's allowable interest expense; (2) whether DPW properly allocated PHI's investment income among its various facilities, including Sycamore, based upon the expenses of each facility relative to the expenses of all the facilities; and (3) whether DPW properly limited Sycamore's interest expense claim after refinancing to the amount under the original loan.

Sycamore is one of several facilities owned and operated by PHI, which is a non-profit corporation. Sycamore is entitled to reimbursement of the cost of care provided to qualified Medicaid patients. In 1988 and 1989 PHI received disbursements from estate planning trusts totalling $147,764.28 and $103,997.30, respectively. In late 1987 Sycamore accepted an invitation from the Farmers Home Administration to refinance and pay off an existing $1.2 million loan at 5% interest for forty years in exchange for forgiveness of approximately $400,000. Sycamore secured refinancing from a bank at

10.3% for three years, to be followed by a variable rate, with a term ten years shorter.

DPW's Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities (Manual) is codified as amended at 55 Pa.Code §§ 1181.101–1181.274. Interest on capital indebtedness is among the costs expressly identified as allowable. § 1181.212(25). Certain forms of investment income, however, are used to offset the allowable interest cost, § 1181.260(h) and (m), and the allowable interest on capital indebtedness may not exceed that which a prudent borrower would pay. § 1181.260(e).

In reviewing PHI's cost reports for the years at issue, DPW's auditors applied all of the money PHI received from the testamentary trusts to offset PHI's claim for interest costs. In addition, they allowed interest costs on the refinanced loan only to the extent of what Sycamore paid before refinancing. Sycamore challenged these adjustments, as well as the method the auditors employed for allocating PHI's home office income among the facilities, at a hearing before an attorney examiner.

The attorney examiner concluded that all receipts from testamentary trusts fell within the definition of "Investment income" in 55 Pa.Code § 1181.202: "Actual or imputed income available to or accrued by a facility from funds which the facility invests or lends *or which are held by others for the benefit of the facility.*" (Emphasis added.) He stated that the situation here is similar to that in *Tressler Lutheran Service Assocs., Inc. v. Department of Public Welfare,* 100 Pa.Commonwealth Ct. 279, 514 A.2d 661 (1986), where the Court held that investment income of the cash management office of a parent corporation was properly allocated among the separate nursing facilities it owned and operated and then offset against their interest expense claims.

1. The Director of the Office of Hearings and Appeals issued a final order dated May 31, 1994. On June 15, 1994, Sycamore filed a petition for reconsideration with DPW. On June 30, 1994, Sycamore filed a petition for review of that order with this Court. DPW granted reconsideration by order of June 22, 1994, and the Secretary issued his order upholding the Director's order on August 30, 1994. Sycamore filed a petition for review from that order and moved for consolidation of the two petitions for review, which was granted. Pursuant to Pa.R.A.P. 1701(b)(3), a timely grant of reconsideration by a government unit renders inoperative a petition for review filed or docketed with respect to the prior order. Therefore, the order subject to review here is that of the Secretary following reconsideration.

"Interest allowance" is the subject of 55 Pa.Code § 1181.260. Except for receipts from four specific trusts, the attorney examiner concluded that the trust proceeds were not exempt from use for offset under § 1181.260(h)(1), which provides that investment income shall be used to reduce allowable interest expense unless it is from "[g]ifts or grants, of which the corpus and interest are restricted by the donor." He further concluded that even money received from those four trusts was covered by the language of § 1181.260(m): "Income earned from funds included in a trust agreement, including those funds deemed to be funded depreciation, shall be offset against allowable interest on capital indebtedness," which he stated was not limited to business-related or investment-related escrow accounts only.

The attorney examiner also found applicable § 1181.273(a): "Any form of investment income from the use of restricted funds found to be used for purposes other than their designated purpose, will be used to reduce the allowable interest on capital indebtedness first, then other interest." Finally, the attorney examiner concluded that all the money PHI received from trusts must be used for offset because it was placed in a large general account containing PHI's gross revenues. Without separation and channeling of particular money directly into the operation of a particular facility, it could not be determined whether the money was used for its designated purpose.

## I.

### a.

■ On appeal,[2] Sycamore first notes the attorney examiner's finding that testamentary trust contributions "differ considerably from traditional investments or business trust related income," Finding of Fact (F.F.) No. 8, and contends that his reliance on *Tressler* was misplaced. There the Court noted that the parent corporation was the provider; its operations were funded by do-

nations and grants (the nursing homes did not generate funds for investment); and the parent allocated funds to the cash management office, which then earned the investment income at issue in the case. Emphasizing that only one corporation was involved—the petitioner—the Court held that its internal operating procedures should not be used to increase the amount of public reimbursement. Sycamore stresses that the income at issue in *Tressler* and the cases on which it relied was on funds owned by the provider and controlled by its home office, whereas the funds that generate the income PHI receives from testamentary trusts are owned and controlled by the decedent donors' nominees—bank trust departments—and are not controlled by PHI in any way.

■ Concerning particular trusts, Sycamore notes that the trust established under the will of Charles Shock specifically recites that the funds are to be used for boarding homes for elderly needy women and not for a nursing home for "bed-stricken patients." The trust contributed $54,834.75 to PHI in 1988 and $28,561.64 in 1989. The Shock Home did not offer services reimbursable by Medicaid, and it operated at a loss. F.F. Nos. 13–15. In 1988 only, PHI received $2,247.92 from a trust established by the will of Sara Palmer, over which PHI had no control. The trust specifies that income be directed to the Presbyterian Homes at Newville, Pennsylvania, where no reimbursable nursing care is provided. F.F. Nos. 28 and 29.

The Elizabeth Allen estate trust contributed approximately $250 each year, specifying that the money is to be used by the Ladies Auxiliary of the Presbyterian Homes of Central Pennsylvania, the predecessor of PHI. PHI received $4,212.30 from a trust from the estate of Anna Davis, which directs that the income from the trust is to be used to benefit a separate PHI facility, Westminster Village, which includes a nursing home. F.F. 35–37. A trust created by the will of Ellen A. Parker

**2.** This Court's scope of review of a decision of DPW in a Medicaid reimbursement appeal is limited to a determination of whether the adjudication was in accordance with law, whether any constitutional rights were violated and whether the findings of fact on which the decision was based are supported by substantial evidence in the record. *Leader Nursing Centers, Inc. v. Department of Public Welfare,* 82 Pa.Commonwealth Ct. 53, 475 A.2d 859 (1984).

contributed approximately $49,000 in each of the years at issue; PHI was required to use the money in a manner consistent with the trust purposes, and no reimbursable medical care was provided at the Parker Home. F.F. 16–18.[3] The Charles Baker trust contributed nearly $6,000 to PHI in 1988 and nearly $4,000 in 1989; of those amounts $2,628 in each year was a distribution of principal, not of interest income. F.F. 19–22. PHI received $5,000 as part of the termination of the small trust created by the will of Edith Halfpenny; it was required to comply with the trust directives. F.F. Nos. 26–27.

Sycamore argues that contributions of the principal of a trust cannot be regarded as investment "income" from a trust. It also contends that the attorney examiner erred in concluding that the § 1181.260(m) offset for income earned from funds included in a trust agreement applies in this case. Sycamore argues that the § 1181.202 definition of investment income and § 1181.260(m) are intended to apply to business or investment-related escrow accounts, not to the testamentary trusts involved here, citing *Atlas Dev. Ass'n, Inc. v. Department of Public Welfare*, 138 Pa.Commonwealth Ct. 24, 587 A.2d 817 (1991) (money in a debt service reserve fund established by the provider, which was to be held by a trustee and to be used for purposes of the provider's bond issue, was subject to § 1181.260(m)).

Sycamore maintains that the purpose of the regulations is to encourage facilities participating in Medicaid to use their own capital resources first, before requiring the state to provide reimbursement for interest on their capital borrowing. In the context of testamentary donations to a charitable institution such as PHI, classifying such gifts as investment income destroys the value of them to the institution and in so doing directly contravenes the intent of the testators. Such a policy can only work to discourage charitable institutions from seeking out sources of private, benevolent funding.

In response DPW first refers to the principle that an agency's interpretation of its own regulation controls unless the interpretation is plainly erroneous or inconsistent with the language of the regulation or the underlying statute. *Department of Public Welfare v. Forbes Health System*, 492 Pa. 77, 422 A.2d 480 (1980). DPW then relies upon *Spang Crest Home v. Department of Public Welfare*, 113 Pa.Commonwealth Ct. 563, 538 A.2d 87 (1988), where this Court agreed with DPW that income from a charitable trust paid by a trustee bank to a religious organization for the maintenance of a particular nursing home, pursuant to the direction of the settlor, fell within the definition of "Investment income" in 55 Pa.Code § 1181.202 as income from "funds ... held by others for the benefit of the facility."[4]

In view of the holding in *Spang Crest* that investment income received from private testamentary trusts falls within the definition of investment income, DPW's position on this point must prevail. DPW's interpretation of its own regulation is not plainly erroneous or contrary to the language of the regulation or the policy of the underlying statute.[5] This conclusion does not end the inquiry, however.

---

3. A 1945 court order states that operation of a children's home as provided in the will is no longer possible, and the accumulated interest should be added to the principal and the net income from the entire fund should be paid from time to time for the general purposes of PHI's predecessor. N.T. November 23, 1992, Ex. A–14.

4. The holding applied only to trust income proceeds received after the effective date of the definition, July 1, 1983. 13 Pa.B. 2402, 2407 (1983). The Court held that money received from the same trust *before* the effective date was not properly offset, because it was not generated by the umbrella organization as in *Tressler* and other cases but rather came from a trust apparently managed by a bank where the donor's

specific intent in setting up the trust was to benefit the religious organization.

5. The Court takes notice that the history of the adoption of the definition of investment income in § 1181.202 and of the provision in § 1181.260(m) for offsetting all "[i]ncome earned from funds included in a trust agreement" supports Sycamore's position that these provisions were intended to reach only business-related accounts ultimately owned by the provider. *Spang Crest* determined that the new definition effected a change from the previous law. The Notice of Proposed Rule Making in 1982 made no mention of applying the investment income offset rule to reach contributions from testamentary trusts of unrelated persons, and no definition of the term

### b.

The subject matter of this proceeding is Medicaid reimbursements and offsets against them. Sycamore is correct in its contention that investment income that is donor-restricted to facilities that do not participate in Medicaid, and so are not entitled to reimbursement under the Medicaid program for the cost of interest or any other expenses, cannot be used to offset interest costs of Medicaid facilities. The federal Medicare Provider Reimbursement Manual (HIM–15) supplements DPW's regulations. *See* 55 Pa. Code § 1181.201. Section 2150.3 of HIM–15, on which DPW relies, is headed "Allocation of Home Office Costs to Components in Chain." Section 2150.3E., "Allocation of Interest Expense and Investment Income of Chain Operations," provides that interest expense and investment income of the home office "which is subject to offset" against allowable interest expense must be allocated according to the methodology of Subsections 2150.3A.–C., relating to allocation of allowable home office costs.

■ As to these home office costs, Subsection 2150.3B, "Costs Directly Allocable to Components," provides: "The initial step in the allocation process is the direct assignment of costs to the chain components. Allowable costs incurred for the benefit of, or directly attributable to, a specific provider or nonprovider activity must be allocated directly to the chain entity for which they were incurred." Although unrestricted gifts to PHI of income from funds held for that purpose are "investment income" of the home office under 55 Pa.Code § 1181.202, to be allocated on the same basis as home office costs, gifts restricted to use for components of PHI that do not claim Medicaid reimbursement (such as the Shock Home) are not investment income of a provider or part of

the home office investment income that is available for offset.

■ The attorney examiner also erred in concluding that even donor-restricted income from testamentary trusts was nonetheless available for offset because all such money was placed in a large general account containing the gross revenues of PHI and was not channeled directly to the operations of any particular facility. This decision apparently was based on the former Manual Section IV.(D)(10)(e) specification that investment income that was "derived from gifts or grants which are restricted by the donor and which are accounted for separately from other funds" would not be used for offset against allowable interest cost. As quoted above, the present version of this provision, § 1181.260(h)(1), does not include a requirement for separate accounting. Moreover, the Court in *Spang Crest* addressed a similar assertion that donor-restricted funds were not accounted for separately:

> Here, as we have noted, LSS commingles the income from the Strickler Trust and does not pass on to Petitioner, either in kind or in goods or services which can be identified as having been purchased by those funds, the exact dollar amount received from the trust. It is also true, however, that LSS can, as an accounting matter, identify exactly how much money it did receive from the trust. Since that income is accounted for by LSS on its books and is easily ascertainable for audit purposes by the DPW, we do not think the subsequent commingling of that income is fatal to Petitioner's effort to apply the restricted income exceptions set forth in Section IV–D–10–e.

113 Pa.Commonwealth Ct. at 570–571, 538

---

"Investment income" was included when the Notice was published. 12 Pa.B. 3525 (1982). In that Notice proposed Section 204.10(m), which was later renumbered as § 1181.260(m), provided: "Income earned from all trust accounts, such as debt service reserve funds or bond sinking funds, must be offset against interest on capital indebtedness." 12 Pa.B. 3533.

When the new regulations were adopted, the definition had been added, 13 Pa.B. 2410 (1983), and § 1181.260(m) had been modified to its present form, which is susceptible to a much broader interpretation. 13 Pa.B. 2417. The introduction to the promulgation makes no mention of the addition of the definition. It lists some changes to § 1181.260, but it makes no mention of those to subsection (m). The introduction states that

A.2d at 91.[6]

■ The third error in the attorney examiner's analysis is the failure to distinguish between contributions that were distributions of income from trusts and those that were distributions of corpus. The investment income offset rule applies to earnings of (or attributable to) the provider and requires that such earnings be offset against claims for Medicaid reimbursement for interest expenses on the provider's borrowing. Section 1181.260(m), for example, which most specifically addresses money received from trusts, provides that "[i]ncome *earned* from funds included in a trust agreement ... shall be offset against allowable interest on capital indebtedness." (Emphasis added.) The rule does not purport to require that straightforward gifts and donations to a provider be used to offset interest expenses. A distribution of a portion of the corpus of a trust is not a distribution of income earned by that corpus. Consequently, distributions expressly identified as portions of the corpus of a trust, such as the $5,000 from the termination of the trust of Edith Halfpenny and the $2,628 from corpus of the Charles Baker trust, are not subject to offset against Medicaid interest claims.[7]

The above rationale applies also to the grant PHI received from the Harry C. Trexler Trust. Testimony (N.T. November 23, 1992 at p. 64) and documentary evidence (N.T. November 23, 1992 Sycamore Exhibit No. A–9) indicated that grants may be received by charitable organizations such as PHI only by making application to the Trust, and the grant to PHI was mistakenly listed along with receipts from decedents' estates.

Because the Trexler funds are held for the benefit of charitable organizations in general, they are not held "for the benefit of the facility [i.e., PHI]" within the meaning of the § 1181.202 definition of "Investment income."

Accordingly, the Court must remand for a recalculation of the offset. Income from the Shock and Palmer trusts must be excluded, as must income from the Davis trust, which is restricted to use at another facility. The gifts of trust corpus from the Baker, Halfpenny and Kerr trusts and the grant from the Trexler trust also may not be used for offset. PHI receives and uses the income from the Allen trust, rather than the women's auxiliary to which it is directed; hence that income is included, as is income from all the other trusts, which is not donor-restricted.

## II.

■ The second broad issue concerns the method by which the auditors allocated the investment income of PHI among the several facilities to arrive at the amount to be charged against Sycamore. Sycamore contends that a formula based on square footage of each facility relative to the total square footage of all is a fairer basis for such allocation. The attorney examiner found that DPW allocated this income by developing for each facility a percentage based upon the costs of each divided by the total costs for all of the facilities. F.F. Nos. 52, 88. He found that DPW has no policy regarding such allocation and that it will consider and may apply other rational methods suggested by providers, F.F. Nos. 56–59, and that there seems to be no rational relationship between an indi-

---

"[e]ditorial changes" were made to §§ 1181.202 and 1181.260, among others.

**6.** The foregoing also answers the attorney examiner's mistaken application of the provision of § 1181.273(a) that any form of investment income from the use of restricted funds "found to be used for purposes other than their designated purpose" will be used for offset. Under *Spang Crest*, the mere fact of commingling of restricted funds with other funds does not constitute such a showing.

**7.** Of the various arrangements involved in this case, only the will of Anna Davis provided for a gift of a corpus directly to PHI (rather than to a third-party trustee), to be known as the "Anna E.

Davis Fund" and to be invested along with PHI's general endowment funds and the net income used for the general purposes of the facility at Westminster Village. N.T. June 29, 1993 Ex. A–34. DPW asserts that, although the use of investment income was restricted by the donor, the use of the corpus was not; hence this income does not fall under the § 1181.260(h)(1) exception. The Court rejects this position. PHI was not granted power to invade the fund for its own purposes; rather, the corpus was restricted to being maintained as a separate fund for the purpose of generating income to be applied in accordance with the donor's wishes.

vidual facility's operating costs and total operating costs, but there is such a relationship between the square footage of a multi-facility operation and its capital costs. F.F. Nos. 60, 61.

The attorney examiner further stated that HIM–15 § 2150.3D.2. and E. provide that when a chain consists of either unlike health care facilities or health care and non-health care facilities, the home office income is to be allocated on the basis of the cost of each component relative to the total cost for all components; that PHI operates nursing and also personal care and day care facilities; and that if PHI had requested allocation based upon square footage, it is uncertain whether DPW would have approved such a method. F.F. Nos. 89–93.

The resolution of this issue does not turn on the relative merits of Sycamore's proposed square footage method. Both the state regulations (55 Pa.Code § 1181.232, relating to changing the basis for allocating cost centers) and the federal regulations (HIM–15 Section 2105.3C. and D.2.b., relating to costs allocable on a functional basis and pooled costs in home office) provide for consideration of proposals to change the basis for allocation of home office costs (and therefore of home office investment income). Both require, however, a timely written request to make such a change. See Section 1181.232(a); HIM–15 Section 2105.3C. and D.2.b. Sycamore concedes that PHI never made such a request; PHI's Director of Reimbursements, who prepares the cost reports, testified that she first considered using square footage as a method of allocating home office income in 1992. N.T. June 23, 1993 at 130. Therefore, regardless of the merits of the proposed relative square footage method of allocation, the attorney examiner correctly declined to apply it.

### III.

The final issue is the interest payment to which Sycamore was entitled after it refinanced and paid off its previous loan. The regulation at 55 Pa.Code § 1181.260(e) provides:

(e) Allowable interest on capital indebtedness may not exceed that amount which a prudent borrower would pay. Interest on capital indebtedness may not be considered prudent if the provider cannot demonstrate that the rate does not exceed the rate available from lenders in this Commonwealth to nursing home borrowers at the time that the funds were borrowed. In no event will the upper limit on interest on capital indebtedness exceed the prime interest rate charged by the lending institution at the time funds are borrowed. For the purpose of this section, the time that the funds were borrowed is the date of the loan commitment.

DPW interprets this provision as not permitting reimbursement for interest expense after refinancing beyond that which the facility received before. Also, if a variable rate after refinancing drops below the original rate, the lower rate will be applied.

Because the indebtedness as refinanced is for a substantially lower amount, and the loan matures some ten years earlier than the previous loan, Sycamore contends that the conclusion is inescapable that the effect of the refinancing will be to save the Commonwealth and the Medicaid program money in interest charges. It notes that the attorney examiner made such a finding. See F.F. No. 77.

In *Morris Manor, Inc. v. Department of Public Welfare*, 127 Pa.Commonwealth Ct. 483, 486, 561 A.2d 1342, 1344 (1989), the Court stated: "If a provider chooses to refinance a debt at a higher interest rate, for whatever reason, the DPW has determined that this higher interest rate should not be passed on to the taxpayer." Despite Finding of Fact No. 77, the attorney examiner concluded that, because the refinanced rate was variable after the first three years, it was impossible for Sycamore to prove that the ultimate effect of the refinancing would be a savings on total interest cost. Adjudication at p. 20.

This Court sees no error in the attorney examiner's conclusion or DPW's interpretation of § 1181.260(e). Sycamore may lose some of the benefit it anticipated from refinancing because it will not be reimbursed for its full interest cost. Its argument, however,

goes essentially to the wisdom of the policy embodied in the regulation and DPW's interpretation, not its legality. Such a question is not within the scope of this Court's review.[8] Accordingly, the order of the Secretary of DPW is reversed in regard to testamentary trust investment income to the extent set forth above, and this case is remanded for DPW to recalculate the offset. In all other respects the order is affirmed.

### ORDER

AND NOW, this 27th day of July, 1995, the order of the Secretary of the Department of Public Welfare is reversed in part in regard to the issue of the availability of all funds received by Presbyterian Homes, Inc., or any of its components for offset against allowable interest claims, and this matter is remanded to the Department for further proceedings in accordance with the foregoing opinion. The order is affirmed in all other respects.

Jurisdiction is relinquished.

---

**8.** Sycamore also argues in the alternative that the previous amount of interest should be paid during the life of the new loan, even when the variable rate drops below 5%, as it did in 1991 and 1992, when it was 4¾%, thereby permitting Sycamore gradually to recoup the excess interest payments that it "fronted" during the first three years. At issue in this case is the propriety of the adjustments made by DPW's auditors to Sycamore's cost reports for the years 1988 and 1989, and the Court will not render an advisory opinion as to adjustments for later periods.