**BROOKLINE MANOR, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 1, 2003.

Decided May 16, 2003.

As Amended May 21, 2003.

Peter W. Kociolek, Jr., Harrisburg, for petitioner.

Cynthia W. Williams, Harrisburg, for respondent.

BEFORE: COHN, Judge, LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Brookline Manor (Brookline) petitions for review of a Final Order entered by the Secretary of Public Welfare (Secretary) on July 15, 2002. The Secretary, on the Department of Public Welfare's (DPW) Application/Petition for Reconsideration, set aside the Order entered by her Bureau of Hearings and Appeals to allow reimbursement of some of the capital indebtedness interest reported by Brookline. The Secretary disallowed this interest in its entirety because the debt was incurred from a related party. We reverse.

Brookline is a long-term nursing care facility located in Mifflintown, Pennsylvania, that has provided services to enrollees in Pennsylvania's Medical Assistance (MA) Program for many years. As a nursing care facility, Brookline's compensation for these services is governed by DPW's "Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities."[1] (Manual). Essentially, "allowable costs" under the Manual consist of three components: 1) reasonable and efficient operating expenses,[2] 2) depreciation, and 3) interest on capital indebtedness.[3] To assist in the determination of its allowable costs, Brookline submits an annual Cost Report to DPW prepared in accordance with the Manual.

In July of 1995, ownership of Brookline changed hands. To finance the acquisition, the new owner, Guardian Elder Care, Inc. (Guardian), entered into a Business Loan Agreement and Promissory Note (Note) with Public Credit Company (PCC) on July 1, 1995. The Note was a standard commercial loan agreement that required Guardian to pay interest at the rate of prime[4] plus 2%. Notably, Guardian is owned by four members of the Varischetti family and Raymond L. Calhoun; PCC is a division of Varischetti and Sons, Inc.[5] Be-

---

1. The terms of the Manual have been published by DPW at 55 Pa.Code §§ 1181.201–1181.274.

2. The Manual establishes "allowable net operating costs" as follows:

 The amount of MA reimbursement for allowable operating costs, excluding depreciation and interest, will not exceed the level of net operating costs the Department determines to be reasonable and adequate to meet the costs that an *efficiently and economically operated facility incurs* in meeting applicable State and Federal laws and quality and safety standards.

 55 Pa.Code § 1181.211(b) (emphasis added).

3. The Manual provides, in relevant part, that [A] facility will be reimbursed its allowable net operating costs, plus allowable de-

preciation and interest on capital indebtedness.

55 Pa.Code § 1181.211(a). Then, total allowable costs are apportioned between third party payors, non-MA patients and MA patients. 55 Pa.Code § 1181.212(b).

4. At the time the funds were borrowed, the prime interest rate was 9%. The interest owed under the Note is variable, depending on the prime rate of interest. The source of PCC's funds was S & T Bank, headquartered in Indiana, Pennsylvania; it provided the funds to PCC at prime. Transcript of Testimony 50 (T.T. ___).

5. Varischetti and Sons, Inc. is a Pennsylvania S corporation; the precise legal relationship between the four family members, who own

cause of their common ownership, Guardian and PCC are affiliated or "related" organizations under state and federal regulations. *See* 55 Pa.Code § 1181.202; 42 C.F.R. § 413.17(b)(1).[6] This relationship is not in dispute.

In its 1995 Cost Report,[7] Brookline reported interest on capital indebtedness for the period July 24, 1995 through December 31, 1995, in connection with the loan to Guardian by PCC. DPW subsequently audited the Cost Report and disallowed the interest. Brookline was advised of the results of the audit by letter dated August 21, 1997.

Brookline appealed the audit results on September 19, 1997, and a hearing on Brookline's appeal was held before an Attorney Hearing Examiner at the Bureau of Hearings and Appeals. On March 29, 2002, the Hearing Examiner recommended that Brookline's appeal be sustained. Specifically, she recommended that Brookline "be reimbursed for the capital indebtedness of this loan minus any reimbursement already paid for this expense and minus the interest that exceeded the prime rate of nine percent." Recommendation/Adjudication at 12. She declined to decide Brookline's challenges to certain DPW witnesses[8] and exhibits because the appeal was resolved in Brookline's favor. On April 3, 2002, the Regional Manager of the Bureau of Hearings and Appeals entered an Order adopting the Recommendation in its entirety. DPW sought reconsideration of the Order.

On reconsideration, the Secretary set aside the Order. She held that DPW auditors had correctly relied upon the federal Medical Provider Reimbursement Manual, known as Health Insurance Manual–15 (HIM–15),[9] to disallow the interest reported by Brookline. Without reversing any of the factual findings of the Hearing Examiner, the Secretary also concluded that Brookline failed to show that it was a prudent borrower. She reasoned:

> [Brookline] cannot claim an exception to the bar prohibiting the interest costs in question under the provisions of 55 Pa Code Section 1181.263, relating to costs of related parties. Regulations at 55 Pa Code Section 1181.260(e) require[] that "Allowable interest on capital indebtedness may not exceed that amount which a prudent borrower would pay. Interest on capital indebtedness may not be considered prudent if the provider cannot

---

interests in Guardian, and Varischetti and Sons, Inc. is not of record. It does not matter because all parties agree that Guardian and PCC are "related parties" within the meaning of the applicable regulation.

**6.** 55 Pa.Code § 1181.202 provides,

Related party—An individual or organization that is associated or affiliated with, or has control of or is controlled by, the provider. "Control," as used in this definition, means the power to influence or direct the actions or policies of another.

42 C.F.R. 413.17(b)(1) provides,

(b) Definitions—

(1) Related to the provider. Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by

the organization furnishing the services, facilities, or supplies.

**7.** This report was prepared for Brookline by an independent accounting firm, Stokes & Hind, LLC, whose principal, Daniel Stokes, CPA, has prepared over 250 MA cost reports and testified at the hearing. It was his opinion that the interest reported by Brookline in its 1995 Cost Report was an allowable cost.

**8.** She did, however, find testimony offered by DPW to demonstrate that a "loan" is not a "service" "not helpful and not credible." Recommendation at 11.

**9.** The Manual refers to the federal manual as "HIM–15." 55 Pa.Code § 1181.2. The federal government refers to its manual as "PRM–1." Exhibit C–4.

**demonstrate** that the rate does not exceed the rate available from lenders in the Commonwealth to nursing home borrowers at the time the funds were borrowed."

The [t]estimony in this matter clearly shows that [Brookline] made no effort to shop for loan rates. In fact, [t]estimony shows that the question of financing the purchase of [Brookline] facility was never an issue, having been decided at the very outset. Consequently, [Brookline] cannot demonstrate that the rate of interest does not exceed the rate available from other lenders in the Commonwealth. Therefore, [Brookline] cannot claim to be a prudent borrower.

July 15, 2002 Final Order on the Merits (citations omitted) (emphasis the Secretary's). Brookline then petitioned for our review.[10]

■ The primary issue on appeal[11] is whether Brookline's related party interest on capital indebtedness is a "proper" and allowable cost. Brookline contends that such interest is proper where, as here, the rate was competitive with what was available from other Pennsylvania lenders at the time the debt was incurred. Brookline acknowledges, however, that the interest rate reported cannot exceed prime, regardless of what was actually paid. For its part, DPW contends that both state and federal regulations evince a zero tolerance for treating any interest on affiliated loan transactions as an allowable cost. It cites

HIM–15 as the specific authority for this position.

■ The Manual is the governing authority on the treatment of interest on capital indebtedness. It provides that, "[n]ecessary and proper interest on capital and current indebtedness is an allowable cost." 55 Pa.Code § 1181.260(a). However,

*Allowable interest on capital indebtedness may not exceed that amount which a prudent borrower would pay.* Interest on capital indebtedness may not be considered prudent *if the provider cannot demonstrate that the rate does not exceed the rate available from lenders in this Commonwealth to nursing home borrowers at the time that the funds were borrowed.* In no event will the upper limit on interest on capital indebtedness exceed the prime interest rate charged by the lending institution at the time funds are borrowed. For the purpose of this section, the time that the funds were borrowed is the date of the loan commitment.

55 Pa.Code § 1181.260(e) (emphasis added). In a separate section, the Manual deals with the costs of goods and services that are acquired from an affiliate of the nursing care facility. It states as follows:

[r]elated parties that provide services to the general public may furnish services and supplies to a facility under the pru-

---

**10.** DPW's interpretation of its own regulations is entitled to judicial deference unless it is plainly erroneous, inconsistent with regulations or contrary to the enabling statute. *Suburban Manor/Highland Hall Care Center v. Department of Public Welfare,* 545 Pa. 159, 164, 680 A.2d 867, 869 (1996). Accordingly, this Court's scope of review is limited to a determination of whether the adjudication was in accordance with law, whether any constitutional rights were violated and whether the findings of fact on which the decision

was based are supported by substantial evidence in the record. *Sycamore Manor Health Center v. Department of Public Welfare,* 663 A.2d 820, 823 n. 2 (Pa.Cmwlth.1995).

**11.** Brookline also contends that the Attorney Examiner erred in admitting DPW exhibits C–1 through C–3, and in excluding the testimony of Edward Inzana. We, too, decline to decide these issues as the evidence in dispute is not essential to Brookline's claim.

dent buyer concept,[12] *provided the costs of the services and supplies are consistent with costs of these items furnished by independent third party providers* in the same geographic area.

55 Pa.Code § 1181.263(a) (emphasis added).

In sum, under the Manual, allowable interest may not exceed the "prudent borrower" rate, *i.e.*, "the rate available from lenders to nursing home borrowers at the time . . . ." In no case, however, may the allowable interest exceed the prime rate of interest.[13] Further, a nursing home that obtains services from a related party may treat the cost of those services as reimbursable, so long as the charges are competitive.

DPW contends that these two provisions of the Manual do not provide the answer on Brookline's related party interest and, therefore, the answer lies in the federal manual, HIM–15. The Manual itself states that HIM–15 and the federal regulations "appropriate to the reimbursement of nursing facility care under the Medicare program are a supplement" to the Manual. 55 Pa.Code § 1181.201(b). Notably,

> If a cost is included in [the Manual] as allowable, then the HIM–15 and applicable Federal regulations will be used as a source of more detailed information on that cost. The HIM–15 and applicable Federal regulations will not be used for any cost that is determined to be nonallowable either by a statement to that effect in this [Manual] or by virtue of

the fact that the cost is not being addressed in this [Manual], *nor will the HIM–15 or applicable Federal regulations be used to alter the treatment of any cost provided for in this [Manual].*

55 Pa.Code § 1181.201(b) (emphasis added). Further, pursuant to the Manual:

> (d) Allowable operating costs for a general nursing facility including hospital-based and special rehabilitation facilities, shall be determined subject to the following:
>
> (1) The Department's Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities.
>
> (2) The HIM–15, *except that if the Department's Manual and the HIM–15 differ, the Department's Manual applies.*
>
> (3) The M.S.A. § or non-MSA group ceilings if applicable.

55 Pa.Code § 1181.65(d) (emphasis added). In short, the federal HIM–15 cannot be used where it conflicts with Pennsylvania's Manual.

There are several flaws in the Secretary's reliance upon HIM–15 [14] to disallow the interest reported by Brookline. First, the Manual is not "silent" on this issue. It states that "[n]ecessary and proper interest on capital and current indebtedness is an allowable cost." 55 Pa.Code § 1181.260(a). According to the Manual, "[t]o be considered *allowable, necessary and proper,* the interest expense shall be

---

**12.** The "prudent buyer concept" is defined as "[t]he purchase or rental by a facility of a property, plant, equipment, service, supply and the like, may not exceed the cost that a prudent buyer would pay in the open market to obtain these items." 55 Pa.Code § 1181.265.

**13.** This leaves open the theoretical possibility that in some cases a "prudent" nursing care

facility will be able to borrow at a rate less than prime.

**14.** Under Section 218 of the HIM–15, to be allowable, capital indebtedness interest must be paid to a lender that is "not related through control, ownership, or personal relationship to the borrowing organization." This principle is repeated in the federal regulations at 42 C.F.R. § 413.153(b)(3)(ii).

incurred and paid within 90 days of the close of the cost reporting period on a loan made to satisfy a financial need of the facility and for a purpose reasonably related to patient care." 55 Pa.Code § 1181.260(f) (emphasis added). Second, the Manual specifically addresses related party transactions by stating that *"[r]elated parties that provide services[15] to the general public* may furnish services and supplies to a facility under the prudent buyer concept...." 55 Pa.Code § 1181.263(a) (emphasis added). Since the Manual is not silent on these concepts, the DPW's reliance on *Northwood Nursing & Convalescent Home, Inc. v. Department of Public Welfare*, 523 Pa. 483, 567 A.2d 1385 (1989) and *Suburban Manor/Highland Hall Care Center v. Department of Public Welfare*, 545 Pa. 159, 680 A.2d 867 (1996) is misplaced.[16] Finally, although HIM–15 and the federal regulations may specifically disallow related party interest[17] on capi-

tal indebtedness, the Manual does not. When the Manual and HIM–15 differ, the Manual controls. 55 Pa.Code § 1181.65(d)(2); 55 Pa.Code § 1181.201(b).

 DPW next argues that even if related party interest on capital indebtedness is an MA allowable expense under Section 1181.263(a) of the Manual, Brookline has not shown that the interest expense was prudent because it did not shop for loan rates.[18] We disagree.

As previously stated, pursuant to Section 1181.260(e) of the Manual, "[a]llowable interest on capital indebtedness may not exceed that amount which a prudent borrower would pay." 55 Pa.Code § 1181.260(e). Such interest may not be considered prudent "if the provider cannot demonstrate that the rate does not exceed the rate available from lenders in this Commonwealth to nursing home borrow-

---

15. DPW's argument that providing commercial loans is not a "service" defies logic, as well as the rules of statutory construction. The testimony of DPW's witnesses on this point was found neither credible nor helpful by the Hearing Examiner.

16. DPW cites these cases for the proposition that if the Manual is silent, HIM–15 and the federal regulations will be used to fill in the gap. In this case, as explained above, the Manual is not silent.

17. HIM–15 and the federal regulations also require a "prudent borrower," which it defines as a loan with terms and conditions found in arms length transactions with lending institutions. "The intent of this provision is to assure that loans are legitimate and needed, and that the interest rate is reasonable....Therefore, if interest on loans by partners, stockholders, or related organizations is disallowed as a cost solely because of the relationship factor, *the principal of such loans is treated as invested funds in the computation of the provider's equity capital under § 413.517.*" 42 C.F.R § 413.153(c)(1) (emphasis added). Section 413.517 states in relevant part that "[a] reasonable return on equity capital invested and used in the provision of

patient care is paid as an allowance in addition to the reasonable cost of covered services furnished to beneficiaries by proprietary providers." 42 C.F.R. § 413.157(b). In short, the federal regulations treat the related party loan as equity and allow the provider a reasonable return, or profit, on that equity. This is not, however, "zero tolerance." It is, simply, a different approach.

18. The Secretary relies on one remark rather than the testimony in its entirety. *Wilkes–Barre City v. Workmen's Compensation Appeal Board*, 54 Pa.Cmwlth. 230, 420 A.2d 795, 798 (1980) (the final decision should not rest upon a few words taken out of the context of the entire testimony). It is not even clear what is meant by "shopping" a loan. The prudent borrower should not have to incur the expense of a loan application simply to generate documentary evidence that a loan from an affiliate was competitive. Interest rates are a matter of public record; it was DPW's burden to rebut Brookline's evidence that the interest rate on its capital indebtedness not only met the competition but was more favorable than what was available in the marketplace.

ers at the time that the funds were borrowed." *Id.*

Here, there was credible testimony before the Hearing Examiner that in 1995, PCC was in the business of extending loans to commercial borrowers.[19] Transcript of Testimony 43–44 (T.T. ___). In July of 1995, PCC loaned money to Guardian to finance the purchase of Brookline. The interest rate offered to Guardian, prime plus 2%, was a very favorable rate for a commercial loan at the time, particularly for a relatively new company, without a credit history, seeking to acquire nursing facility assets. T.T. 12–16, 21–22, 47–48, 53. In fact, the rate offered to Guardian was below the average interest rate offered to other PCC customers during the relevant time period.[20] T.T. 48, 131–132. Finally, the terms of the Note executed by Guardian did not differ in any material respect from others offered by PCC in 1995. T.T. 35, 83. This evidence assures us that the loan was necessary and that the interest rate was reasonable. Accordingly, Brookline has satisfied the purpose of the prudent buyer concept.

Pennsylvania's MA Program is coordinated with, and partially funded by, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396—1396r. Both the federal and state governments have issued manuals that govern the reimbursement to nursing care providers, such as Brookline. However, as has been noted by our Supreme Court, where the two manuals differ, Pennsylvania's Manual governs. *Northwood*, 523 Pa. at 485–486, 567 A.2d 1385.

Here, the Manual expressly authorizes partial allowance of Brookline's interest on capital indebtedness up to the prime rate of interest. To hold otherwise would require Guardian to obtain financing from an unrelated lender at a higher rate of interest. This result serves no public purpose, and it does not advance the overriding objective that providers of nursing care to MA patients operate in an efficient and cost effective way.

For the foregoing reasons, the Final Order entered by the Secretary on July 15, 2002 is reversed.

### ORDER

AND NOW, this 16th day of May, 2003, the Final Order of the Department of Public Welfare dated July 15, 2002, in the above-captioned matter is hereby reversed.

---

**19.** The Manual requires that in any related party transaction, the nursing home affiliate must also provide its services to the public. It states that DPW

> will not recognize as allowable the cost of services provided by related parties if related parties do not provide services to the general public in addition to the [nursing home] facility.

55 Pa.Code § 1181.263(b).

**20.** Specifically, Thomas Nolder, the Controller of Varischetti and Sons, Inc., testified that the average interest rate offered to other PCC customers in 1995 was between 12% and 13%. T.T. 131–132.